FILED ELECTRONICALLY
AND IN HARD COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

                      07 Cr. 960 (RMB)

-against-

                      ECF CASE

OSCAR SANTANA ANA GALLEGOS and
MARTIN ARROYAVE

             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**SENTENCING MEMORANDUM**

Andrew J. Ceresney  (AC 2586)
Vanessa De Simone (VS 1754)
*Attorneys for Martin Arroyave*
**Debevoise & Plimpton LLP**
919 Third Avenue
New York, New York  10022
Ph:  (212) 909-6000
Email: ajceresn@debevoise.com
Email: vsdesimo@debevoise.com

August 26, 2008

<u>BY HAND</u>

The Honorable Richard M. Berman
United States District Judge
United States District Court
  for the Southern District of New York
500 Pearl Street, Room 650
New York, New York  10007

<u>United States v. Oscar Santana Ana Gallegos and Martin Arroyave (07-CR-960)</u>

Dear Judge Berman,

        We are writing on behalf of our client, Martin Arroyave, who is scheduled to be sentenced by Your Honor on September 9, 2008 at 10:30 a.m.  Mr. Arroyave pled guilty to participating in a conspiracy to distribute five kilograms or more of cocaine, in violation of Title 21, United States Code, Section 846.

        The Presentence Report ("PSR") indicates that the Probation Department agrees with determination that Mr. Arroyave meets the criteria for several downward adjustments from his base offense level (36) under the United States Sentencing Guidelines ("the Guidelines"). PSR ¶¶ 5 & 32-42.  In particular, the PSR indicates that Mr. Arroyave is entitled to: (a) a five-level reduction for <u>his minor role</u> in the conduct under U.S.S.G. §§ 2D1.1(a)(3) and 3B1.2(b); (b) a three-level decrease for <u>his timely and complete acceptance of responsibility</u> under U.S.S.G. §§ 3E1.1(a),(b); and (c) the <u>safety-valve</u> reduction (2 levels) and relief from the mandatory minimum sentence under U.S.S.G. §§ 2D1.1(b)(11) and 5C1.2(a), due to <u>his lack of criminal history points and his truthful disclosure to the Government of all information and evidence he has concerning this case</u>.  <u>Id</u>.  With these downward adjustments, Mr. Arroyave's offense level is 26, which correlates to a sentence of 63-78 months.  PSR ¶¶ 5 & 42.

        We respectfully submit that the interests of justice and the goals of 18 U.S.C. § 3553(a) would be best served by a sentence of time served.  Such a sentence is warranted given Mr. Arroyave's positive personal background, his low risk of recidivism, and his deep and sincere remorse for his role in the offense.

The Honorable Richard M. Berman                2                              August 26, 2008


I.   Personal Background

        The story of Martin Arroyave is the story of a man who spent his nearly 39 years
working hard, caring steadfastly for his family and making good choices, until, in a fateful
moment of financial and emotional distress, he made a very bad choice.  Though this mistake
was grave, it does not define his life to date, nor does it accurately reflect his potential for a
meaningful future.

        Mr. Arroyave was born in Medellín, Colombia on August 27, 1969, the middle child
of Jose Arroyave and Maria Roche.  For parts of his childhood, Mr. Arroyave's parents had
to leave the family to seek work outside of Medellín, during which time Mr. Arroyave's
maternal grandmother helped to raise him.  In spite of these absences, Mr. Arroyave was
close to his parents, and his family provided him with a strong, supportive foundation.

        After graduating from high school, Mr. Arroyave had hoped to continue his education
and become a doctor.  He realized, however, that he could not afford college and instead
found work as an auto mechanic.  He later worked in a chain warehouse store and served as a
volunteer firefighter in his local fire department.  Eventually, Mr. Arroyave worked his way
up to a position in the district government, where he was responsible for helping ensure that
proper taxes had been paid on cigarettes and other goods.  He also served as a driver for the
mayor of his district.

        At the same time Mr. Arroyave entered the workforce, he also took the first steps
toward starting a family.  When he was seventeen, he began dating Gloria Alexandra Lopez
— a woman who would remain central to his life until the present day.  See Exhibit C,
attached hereto.  After nearly five years together, Ms. Lopez became pregnant and gave birth
to a little girl, Natacha, on August 30, 1991.  Although Mr. Arroyave and Ms. Lopez never
formally married, Mr. Arroyave was deeply committed to her and Natacha.  They started a
home together, and Mr. Arroyave supported the family financially and emotionally.  Mr.
Arroyave and Ms. Lopez's second child, Cristian, was born on July 14, 1998.

        Mr. Arroyave loved (and still loves) being a parent and was actively involved in both
Natacha and Cristian's lives.  He felt extremely lucky to have his own family and cherished
the time they spent together, whether it was playing games like soccer and basketball, going
to the movies, helping Natacha with her homework, or taking weekend trips to the beach.

        Unfortunately, after a change in the administration of his district government, Mr.
Arroyave found himself out of a job.  He sought new work, but could not find another job,
especially one that could support his family.  In 2000, Mr. Arroyave made the difficult
decision to temporarily leave his family and come to the United States, where his mother and
brother had already moved, in hopes of finding steady employment.

The Honorable Richard M. Berman               3                          August 26, 2008

        For Mr. Arroyave, like many new immigrants, life was centered around hard work:
after briefly working for a security company, Mr. Arroyave started painting houses and
working light construction jobs, mostly in Queens, NY.  He regularly sent money back to his
family in Colombia.  In 2003, Ms. Lopez also moved to New York with Natacha and
Cristian.  Mr. Arroyave gratefully resumed his role as an active and involved father.

        In the fall of 2005, Mr. Arroyave learned that his mother, Maria (called Guimar by
her family), had been diagnosed with terminal lung cancer.  As his mother's health rapidly
declined in 2006, Mr. Arroyave cut down on his work schedule so that he could help care for
her.  Her took her to chemotherapy and other doctor's appointments, picked up her
prescriptions, helped prepare her meals, and simply spent time with her.  Maria passed away
on February 4, 2007, at the age of fifty-five.

        Following his mother's death, Mr. Arroyave found himself in emotional and financial
turmoil.  The small company that had provided most of his painting jobs had gone into
bankruptcy.  He had trouble finding enough new work to pay the bills.  He had spent a
substantial amount of money on his mother's funeral and burial expenses.  He grew deeply
worried about how he would be able to support his family.

        Then, in May 2007, an acquaintance asked Mr. Arroyave about his financial situation.
When Mr. Arroyave responded that he was broke, the man offered him $1000 to serve as a
drug courier, driving a van containing seven kilograms of cocaine from one address in
Queens to the man's home, also in Queens.  Mr. Arroyave was surprised – he hadn't known
the acquaintance was involved in drugs – but he ultimately agreed given his financial
situation.  On July 18, 2007, the acquaintance called to tell him it was time to pick up the
vehicle, which Mr. Arroyave did.  Mr. Arroyave drove the vehicle a short distance to the
man's home, where he was arrested almost immediately and told by the DEA agent "you're
the stupid one they get to drive the drugs."  It was only then that Mr. Arroyave learned the
van had actually contained 70, rather than seven, kilograms of sham cocaine.  Mr. Arroyave
never received any proceeds from his conduct.

II.    Discussion

        As the Government has acknowledged and the PSR also indicates, Mr. Arroyave
meets the criteria for a five-level mitigating role adjustment under U.S.S.G. §§ 2D1.1(a)(3)
and 3B1.2(b).  PSR ¶ 5, 34 & 36.  Although the charged offense was a serious one, Mr.
Arroyave's own role in the conduct was minor: he was simply a courier, responsible only for
transporting the drugs a short distance from one part of Queens to another on one occasion.
See e.g. _U.S. v. Ruiz_, 246 F.Supp.2d 263, 268 (S.D.N.Y. 2002) (courier entitled to minor role
adjustment because he was subordinate to several levels of authority, had limited
responsibility, and knew little about the transaction).  Other than the May 2007 meeting
described above, he played no other part in this transaction and had no previous links to

The Honorable Richard M. Berman                4                    August 26, 2008

narcotics activity.  He did not have a planning or leadership role in the organization and, in fact, was largely ignorant of the details of the larger transaction, including the amount of drugs involved or their source.  Mr. Arroyave was promised only $1000 to serve as a courier and, due to his immediate arrest, received no actual proceeds for his conduct.[1]  He had little to gain, and much to lose.

Mr. Arroyave's minor role, at the very lowest and riskiest rung of the transaction's hierarchy, shows that he is not a seasoned and sophisticated criminal who skillfully reaped the benefits of illegal activity.  He is not a drug kingpin, nor even a repeat player.  Instead, he is an ordinary person who made a very bad choice.  Mr. Arroyave's minor role in the offense does not excuse his conduct, but it does indicate that he should be judged less harshly than someone who played a more important or sustained role in a similar transaction.  Based on this adjustment, as well as other adjustments, Mr. Arroyave's Guideline's range is 63-78 months.

The factors listed in 18 U.S.C. § 3553(a)[2] strongly suggest that the fairest sentence here would be one well below the Guidelines range.  Under § 3553(a), a sentencing court must consider the "the nature and circumstances of the offense and the history and characteristics of the defendant" and ensure that the sentence imposed is "sufficient, but not greater than necessary," to comply with the four enumerated purposes of incarceration: retribution, deterrence, incapacitation, and rehabilitation.  18 U.S.C. § 3553(a), (a)(2).  Together, these factors counsel for a sentence of time served in Mr. Arroyave's case.

---

[1]    Given the fact that Mr. Arroyave received no proceeds from the conduct and has no assets, we respectfully submit that Mr. Arroyave's sentence should not include a fine nor forfeiture penalty.  Mr. Arroyave is unable to pay any fine under U.S.S.G. § 5E1.2.

[2]    Section 3553(a) provides that that sentencing court shall consider:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
18 U.S.C. § 3553(a)(2).

The Honorable Richard M. Berman            5                    August 26, 2008

First, the "big picture" of Mr. Arroyave's history and personal characteristics makes it clear that he is not a hardened criminal, but rather a good, family-minded person who, on one occasion, veered from the positive track he had laid out for himself. Prior to July 18, 2007, he did not engage in fast living or illegal activity: instead, he was a caring and responsible father, a devoted and helpful son, a steady provider for his family and a reliable, hard worker. As the attached letters from his family and friends reflect, he earned the respect of those around him and has maintained extremely close ties with his family, even during his incarceration. See Exhibits A-S. With the support of his family and friends, Mr. Arroyave is now ready and able to get back on the positive track.

Second, Mr. Arroyave's case does not present a need for specific deterrence, incapacitation or rehabilitation. Prior to his arrest in this case, Mr. Arroyave had supported himself in the United States through legitimate and gainful employment as a painter and construction worker and had never been involved in the drug trade. He has no established connections to drug organizations or individuals involved in the drug trade that could threaten to pull him into illegal activities after his release. He has never engaged in violence and has not shown a propensity to harm others. Accordingly, Mr. Arroyave is an extremely low-risk for recidivism.

Third, Mr. Arroyave is deeply and sincerely remorseful for his actions, and his failure to uphold the values that have otherwise guided his life. Natacha and Cristian are now old enough to know why Mr. Arroyave is incarcerated, and Mr. Arroyave has been honest with them about his conduct. He realizes that by engaging in the conduct, he failed to be the good role model for his children that he had always strived to be. Mr. Arroyave also understands that, since he is not a U.S. citizen, he is very likely to be deported following his sentence, while his children will remain here to finish their education. For Mr. Arroyave, this separation from his family will be its own devastating punishment.

Indeed, Mr. Arroyave's absence during his incarceration has already impacted his family in immeasurable ways. Since his incarceration, his son, Cristian, has begun struggling in school and no longer participates in class. Cristian, who is ten years old, has become so withdrawn that the school has recommended that he see a psychologist. Cristian and Natacha's mother, Gloria Lopez, is also struggling with emotional and health problems. After recently noticing a growth on her arm, Ms. Lopez was given a series of tests by her doctor, including an MRI. The MRI revealed a mass on her brain, and doctors are now conducting follow-up tests. Although Ms. Lopez has not yet received a diagnosis, she is understandably frightened and stressed by this health crisis, especially since she must face it without Mr. Arroyave's day-to-day support or assistance with the children. As a result, Ms. Lopez has also begun receiving psychological services through her employer. Mr. Arroyave recognizes, and deeply regrets, that this already distressing situation has been made much more difficult for Ms. Lopez and his children because of his incarceration.

The Honorable Richard M. Berman                6                          August 26, 2008


       In light of the significant personal consequences Mr. Arroyave and his family will face as a result of his actions, his deep remorse for his conduct, his minor, non-violent role in the offense transaction, and his positive personal background, a sentence of time served is sufficient to fulfill society's interest in punishing Mr. Arroyave for his conduct.

       Finally, in the event that Mr. Arroyave is sentenced to additional time, he respectfully requests that he be designated to the Federal Correctional Institution in Otisville, New York, so that his children can continue to visit him on a regular basis.  We respectfully ask that Your Honor make such a recommendation to the Bureau of Prisons.


               Respectfully submitted,


               _/s/ Andrew J. Ceresney_
               Andrew J. Ceresney
               Vanessa De Simone


cc:    Assistant United States Attorney Parvin D. Moyne
       Martin L. Schmukler, Esq.